BANK OF WASHINGTON *against* JOHN BARRINGTON
and DANIEL MOORE, surviving obligors of JOHN HUGHES,
THOMAS ACHESON, and ROBERT HAZLET, deceased.

IN ERROR.

The Cashier of an incorporated bank gave a bond with sureties, conditioned that he
would "well and truly perform the duties of cashier." By the act of incorpo-
ration the bank was required to pay annually to the state treasurer six per cent. of
the amount of dividends; on failure of which for a specified time, the charter
was thenceforth to become "absolutely null, and void, and of no effect what-
ever," and the bank to be "dissolved, unlawful, and unincorporated," except
inasmuch as corporate capacity should be necessary to the enforcement of
contracts made by it or with it, before the period of its delinquency. Within that
specified time, by the omission of the cashier, the six per cent. on the dividends
was not paid to the state treasurer, by which the charter was forfeited, in the be-
ginning of January, 1818: by an act passed the 2d February ensuing, the charter
was "revived and continued in as full force and ample a manner as if no forfeiture
had taken place." *Held* that the sureties were not liable to the bank for the de-
faults of the cashier, which happened subsequently to the act of restoration.

A cashier of a bank, although appointed by the directors, is the agent of the compa-
ny; and if he permits a transfer of stock to be made to the bank, to an amount pro-
hibited by a fundamental article of the charter, he is answerable to the stockholders
for any loss which may accrue in consequence of such transfer: notwithstanding
a resolution of the board of directors authorizing it.

A plaintiff having brought a suit upon a bond, and declared upon it as the bond of
four persons, is not thereby estopped, in another action on the same bond, from
declaring upon it as the bond of five persons.

When a conversation of a party in interest is given by a witness, the jury is not bound
to believe the whole of it: they may believe a part, and disbelieve a part.

An error against the bank, in the addition of a column of figures by the cashier, is
*prima facie* evidence of a loss to the bank, to the amount of the error; and in
order to avoid liability on the part of the cashier or his sureties, the burden of
proof lies upon them to shew that no loss accrued.

It is the duty of the cashier to forward to the state treasurer the duties on dividends
declared by the bank, and his omission to do so is a forfeiture of his bond, for
which he and his sureties are liable to the amount of the injury to the bank
necessarily occasioned thereby.

The liability of a surety is commensurate in duration with the commission of his
principal.

The contract of a surety, being without a beneficial consideration, is not to be ex-
tended beyond its strict technical import.

APPEAL by defendant from the judgment of the Circuit Court
of *Washington* county, held by his Honor *Justice Rodgers*.

This was an action of debt brought by the Bank of Washington
against *John Barrington* and *Daniel Moore*, surviving obligors
of *John Hughes*, *Thomas Acheson* and *Robert Hazlet*, deceased.
The writ was served on *Moore* alone.

Plaintiff declared on a bond dated the 25th of August, 1814,
which it was alleged was given by *John Barrington*, *Daniel
Moore*, *John Hughes*, *Thomas Acheson*, and *Robert Hazlet*,
to the plaintiff for thirty thousand dollars.

Defendant, *Daniel Moore*, praved oyer of the writing obligatory and the condition thereof, and plead *non est factum*, no breach, and performance of the condition, with leave to give the special matter in evidence. The plaintiff assigned breaches as hereafter stated.

*James Sergeant*, (witness sworn,) said—"he subscribed the bond as a witness; that he saw *James Reed*, the other subscribing witness, sign it; that *John Barrington*, *Daniel Moore*, *John Hughes*, *Thomas Acheson*, and *Robert Hazlet* were all present and acknowledged the bond to be theirs, but nobody was there, that he recollected on the part of the bank."

The name of *Robert Hazlet* in the body of the bond and his signature to it were erased.

*Thomas H. Baird*, Esq. (sworn.) Bond shewn to witness— "thinks he was absent at the time of giving the bond—When I returned, think *Barrington* and *Hazlet* had quarrelled. The first time I saw the bond I think *Hazlet's* name was struck out. I have an indistinct recollection of the board consenting to *Hazlet's* name being struck out of the bond, provided the other sureties would consent. I think I saw the bond in the bank afterwards, but have no doubt the name of *Hazlet* must then have been struck out. I have no knowledge of the erasure of *Hazlet's* name from the bond whatever. I never had any conversation with *Barrington* in relation to it, until after the present controversy arose, when he came hither to attend a trial of the former action on the bond; it was not tried, however at the time. He came to my house, we had a good deal of conversation, I told him what I thought of it, I told him "you must have struck out *Hazlet's* name," he said, "if I did, it was done in the presence of the board and with their consent." He did not deny it, but gave the reply which I have related. There never was any resolution on the subject of striking out *Hazlet's* name that I know of but one, which appears to be entered. I was present at the election of *Barrington* to be cashier. His appointment was committed to writing."

Resolution of the board of directors, dated 19th of April, 1815, read in evidence as follows, viz.—"Resolved—That the name of *Robert Hazlet* be struck off the said bond of security for cashier, provided the other sureties consent thereto.

Plaintiff's counsel then offered to read the bond in evidence; defendant's counsel objected, and read in evidence the record of a former action brought on the same bond, in which the plaintiff declares it to be the bond of *John Barrington*, *Daniel Moore*, and *John Hughes*, surviving obligors of *Thomas Acheson*, deceased, admitting thereby that the name of *Robert Hazlet* had been struck out by the bank or by its consent.

(The Bank of Washington *v.* Barrington and others.)

The Court over-ruled the objection and admitted the bond in evidence, which was read and appears on the face of it as follows:

"Know all men by these presents, that we *Robert Hazlet*, *Daniel Moore*, *Thomas Acheson*, *John Hughes*, and *John Barrington*, of the borough of Washington, in the county of Washington, and state of Pennsylvania, are held and firmly bound to the bank of Washington, in the borough, county and state afore-said, in the sum of thirty thousand dollars.

Now the conditions of this obligation are such, that if the above named *John Barrington* does well and truly perform the duties of cashier of the bank aforesaid, to the best of his abilities, then this bond to be void, otherwise to remain in full force and effect.

In witness whereof, we have hereunto set our hands and seals this 25th day of August, in the year of our Lord eighteen hundred and fourteen.

ROBERT HAZLET,      [SEAL.]
DANIEL MOORE,       [SEAL.]
THOS. ACHESON,      [SEAL.]
JOHN HUGHES,        [SEAL.]
JOHN BARRINGTON,    [SEAL.]

Sealed and delivered  }
 in presence of       }
  *James Reed*,
  *James Sergeant.*

There were twenty-two specifications of breaches; but those only are here mentioned which gave rise to the questions of law, and upon which his Honor charged the jury, viz.

No. 3.  1817, January 17.  He made an erroneous addition in the cash book of this date to the prejudice of the bank, $100.

No. 11.  1819, August 11.  He drew cash from the bank for his own stock, without the authority of the directors to the a-mount of $1,732 50.

No. 12.  1819, August 18.  On the debt of *Joseph Pentecost*, due to the bank, he discharged the indorsers and took insufficient security for the same, without the authority of the directors. Amount of loss to the bank, $11,203 52.

No. 14.  1819, November 17th.  He drew his own judgment bond for his own debt, and exonerated his own indorser, *Thomas H. Baird*, without authority: amount. $500.

No. 15.  1819, December 2nd.  He confessed judgment against the bank to the following persons, and transferred the amount in

funds belonging to the bank, to his brother, Charles Barring-
ton, in Philadelphia.

| | | |
|---|---:|---:|
| 2d, Jacob Bowman and son, | $396 | 11 |
| 3d, William Hunter, | 1,908 | 04 |
| 4th, John Wilson, | 2,200 | 68 |
| 11th, Cunningham and Wilson, | 1,035 | 05 |
| | 5,539 | 88 |
| Interest from 2d of Dec. 1819, till 11th Aug. 1829, | 1,268 | 21 |
| | 6,808 | 09 |
| Returned by Daniel Moore April 18th, 1821, | $4,000 | 00 |
| Interest from | | |
| Returned by Daniel Moore October 2d, 1821, | 180 | 38 |
| | 4,180 | 38 |
| Balance | $2,627 | 71 |

No. 22. He permitted the following named persons to transfer
to the bank, in payment of debt, the following amount of stock,
and entered the same to their credit, severally, without any au-
thority therefor, to wit:

Various evidence from the books of the bank, and otherwise,
was then given by the plaintiff, for the purpose of establishing the
breaches assigned under specification No. 22. The plaintiff gave in
evidence the state of the bank, on the 7th day of September,
1819. The amount of capital stock paid in at the time, was
$106,572 50; one-fifth of which would be $21,314 50. Amount
of stock transferred to the bank, up to that date, $18,637. Up
to the 8th of September, inclusive, the amount of stock assigned
to the bank, was $21,782; and between that time and the 1st day
of November, 1819, there were assignments of stock to the bank,
made in payment of debts owing to it, by divers persons, (and
among the number were eleven, out of the thirteen directors of
the bank,) amounting, in the aggregate, to upwards of thirty-four
thousand dollars—making the whole amount of stock transferred
to the bank, at this last date, $55,252 50.

A great variety of documentary and parol evidence was given
by the plaintiff to support the different assignments of breaches.

*Testimony for defendant.—Thomas H. Baird,* Esq. When
I was appointed to my present station, I was anxious to close all
my concerns with the bank, and to have my debt satisfied. As
to the transfer of stock, I cannot recollect precisely the language
that passed; but I understood that the board took my stock, and
that it was transferred to the bank in part payment of my debt,
before I conveyed the property in satisfaction of the residue. I
think the amount of stock was charged to me, in the suit brought

(The Bank of Washington *v.* Barrington and others.)

against me by the bank. I cannot recollect any particular conversation with any of the board of directors; but know my impression was, that they had entered into the arrangement, for the purpose of closing all my concerns with the bank. I thought, the transfer of stock beyond the amount of one-fifth of the whole, was wrong. I gave a bond, with *John Barrington,* as his surety, to the bank, for $1500; for which sum I had originally been his indorser.

The charter of the bank was forfeited in the fall of 1817; and happened in this way:—The packet enclosing a statement of the bank, declaration of the dividends, and the money to pay the duties to the state treasurer, was made up, and was to have been sent by a member of the assembly, who was to have called at the bank for it, but did not; and through his failure the charter of the bank was forfeited. I went as agent for the bank to Harrisburg, and procured a law to be passed, reviving the charter of it.

*John Marshall,* Esq.—affirmed. From November, 1818, until some time in September, 1819, when I transferred my stock to the bank, I was a director of it—know nothing of *Pentecost's* bond. A resolution of the board of directors was passed, authorizing the transfer of stock in payment of debts, which was founded on a previous one to wind up the affairs of the bank. I am not able to fix the precise date of it; it was, may-be, from one to three weeks before I transferred my stock—can fix no precise date; but know it was some time between the failure of the negotiation with the Philadelphia bank, and the meeting of the stockholders in September, 1819. There was an examination into the affairs of the bank, and the stock was considered good—equal to par. Of the directors present at the passage of the general resolution for taking stock in payment of debts, I recollect *Mr. Acheson, Mr. Brice, Mr. Craig,* (who dissented;) and cannot now recollect any more beside myself. I gave a judgment bond to the bank, which was accepted, and transferred my stock, under the resolution of the board to take stock in payment of debts. There was a resolution prior to my coming into the bank, to take stock in payment of debts, reserving 20 per cent. on it. I cannot undertake to state the precise time of the resolution; the opinion was, that as the bank was winding up and closing its concerns, the prohibition in taking the assignment of stock, did not apply. Would not undertake to say, that the general resolution to take stock in payment of debts, was not more than three weeks before I transferred my stock; but know it was between the breaking off of the arrangement with the Philadelphia bank, and the meeting of the stockholders—think it was in the latter end of August, or beginning of September, 1819. Have no recollection of directing the resolution to be put in writing—it was usual for the cashier to put them in writing, as they were made.—(The stock of witness ap-

pears from it date on the transfer-book to have been made on the 13th of October, 1819.)

*George Baird,* (sworn.) I was a director in 1819. A reso-lution was passed to take stock in payment of debts. It was passed after the failure to negotiate with the Philadelphia bank, but cannot say at what time exactly. I cannot tell all the directors who were present—think *Mr. Marshall, Mr. Orr, Mr. Morris, Mr. Pentecost,* and *Mr. Craig,* beside myself, were there. I know *Mr. Craig* opposed the resolution; but whether it was on that day, or afterwards, that he disapproved of it, I am not certain. The state of the bank as the board met from week to week, was laid before the board by the cashier. Cannot recollect what month the resolution was passed in, whether before *Mr. Campbell's* transfer or not, I cannot say. I thought the bank solvent then, but thought it would not be profitable to carry it on. I transfer-red my stock under the resolution; and the directors who were debtors to the bank, transferred their stock in the same way.

*David Acheson,* (sworn.) There was a resolution of the board of directors passed, to receive stock in payment of debts. Before this passed, a committee was appointed to examine into the stock of the bank, which considered it good. I think the resolution was passed on a discount day. Cannot say whether the resolution as to *Mr. Campbell's* stock was before or after—cannot say whether the resolution for taking stock in payment, was before or after the directors published for a meeting of the stockholders. I thought the debts good, and the stock good. It might have been the idea of some, that it was for the benefit of debtors that the reso-lution was passed; but I did not think of it at the time. I cannot tell how many directors were present at the passage of the resolu-tion.

The Court charged the jury as follows:

This suit is brought against *John Barrington* and *Daniel Moore,* the surviving obligors of *John Hughes, Thomas Acheson,* and *Robert Hazlet.* In consequence of the death of *Hughes, Ache-son* and *Hazlet,* and the return of the writ not served on *Bar-rington,* you have been sworn to try the cause against *Daniel Moore,* alone. It is brought to recover damages arising from the breach of a condition of a bond, dated the 25th August, 1814, given to indemnify the bank from any failure in *Barrington* in the faithful performance of his duties as cashier of the bank of Washington.

The bond on which it is founded, is in the penalty of $30,000, with a condition under-written, that *John Barrington* shall well and truly perform his duties of cashier, to the best of his abilities.

The defendant pleads *non est factum,* no breach, and performance with leave, &c.; to which plaintiff replies, and assigns breaches, issue, and rule for trial. The first plea of the defendant is *non est factum;* or, in other words, the defendant, *Daniel Moore,* denies that this is his bond, puts the plaintiff upon proof of its execution and delivery. Of the execution and delivery of the bond by *Barrington, Moore, Hughes, Acheson,* and *Hazlet,* you can have no doubt; the execution was expressly proved by *James Sergeant,* one of the subscribing witnesses to the bond: and there is abundant evidence it was in the possession of the bank, which is sufficient proof of the delivery; indeed, I understand this to be admitted by the defendant's counsel. The bond went into the possession of the bank originally signed by five persons, of whom *Hazlet* was one. Since the sealing and delivery, it has been defaced, by the erasure of the name of *Robert Hazlet,* in the body of the instrument, and a pen has been drawn over his signature and opposite to his seal. On this, the defendant relies to support the plea of *non est factum,* or allegation that the instrument declared on is not his deed.—It will be for the Court to declare to you the law, and for you to determine the facts.

The evidence which more particularly bears on this part of the defence, is the testimony of *Thomas H. Baird,* and the resolution of the directors of the bank. *Judge Baird* testifies, in substance, that he was not at home when the bond was given; and when he returned, *Hazlet* and *Barrington* had quarrelled; and, I think, he stated both were desirous that *Hazlet* should be off the bond. He believes the board agreed that *Hazlet* should be discharged, but it was to be on condition that the other sureties consented. He says he does not recollect to have seen the bond until they got into the banking-house, and that he has no knowledge of the erasure except from *Barrington;* that he never had any conversation until this suit was brought, but that after the commencement of the suit, he and *Barrington* had a good deal of conversation, and that among other things, in speaking in relation to the erasure, he told *Barrington he must have done it;* that *Barrington* replied: If I did do it, it was in the presence of the board, and with their consent. He further stated, that *Barrington* did not deny he did it. *Judge Baird* further testifies, that no consent was given to the erasures by the board while he was present.

The resolution to which *Judge Baird* referred, is dated the 19th April, 1815, and is in these words: "On motion, resolved, that the name of *Robert Hazlet* be struck off the bond, on condition the other sureties consent thereto."—You will observe, the resolution of the directors corresponds with the recollection of *Judge Baird.*

(The Bank of Washington *v.* Barrington and others.)

To whom the bond was delivered in fact, whether to *Barring-tton* or one of the directors, does not appear: we find it in possession of the bank, of which *Barrington,* one of the obligors, was the cashier.   We are warranted in supposing, from the testimony, it was in his custody, and subject to his control, in the same manner as the other notes and bonds of the bank.   The bond went into the hands of *Barrington* without any erasure, but when it was delivered over to *Judge Baird,* the president, the name of *Robert Hazlet* was stricken out of the bond.

An important question of fact for you to determine, will be, by whom was this erasure made, and under what circumstances, and by whose consent?   The principles of law, as applicable to this part of the case, are these:—If the erasure was made with the consent of *Barrington,* the directors, and the sureties, there would be no pretence to say this is not their deed; or, if *Barrington* made the alteration, without the assent of the directors, it is equally plain that it is the deed of the defendant; but if *Barrington* made the erasure with the consent of the directors, but without the knowledge and assent of the sureties, then it is clear it is not the deed of *Moore.*

I have said, that if this erasure was made with the consent of *Barrington,* the directors, and the sureties it is the defendant's deed; because the consent of all the parties interested avoids all error.   There would be no necessity for a re-execution and re-delivery of the bond.   If this consent has been given, *Hazlet* would be discharged, but it would remain the bond of the four remaining obligors.   It will be for you to say whether this be the fact, the proof of which does not require positive evidence, but may be made out by parol, or inference from the circumstances.

If *Barrington* made the alteration without the assent of the directors, it is equally their deed.   You will recollect that *Barrington* was, not only the agent of the stockholders, but he was a co-obligor.   It follows from this, that *Barrington,* of himself, can do no act to discharge himself and his sureties.   It would be manifestly unjust, that he should cut himself loose from his engagements, and, without the consent of the board, release those who had voluntarily bound themselves, as his sureties.   This would be a fraud in *Barrington,* of which the plaintiffs are not estopped to avail themselves in this suit; the former suit is evidence, and has been so received; but it is not conclusive evidence that the directors assented to the erasure.   In this part of the case, you have reference to the testimony of *Judge Baird,* and the resolution of the board, which has been given in evidence.   If then you believe, that this was the act of *Barrington* alone, unauthorized by the directors, your verdict should be in favour of the plaintiff.   The directors authorized him to strike out the name of

*Hazlet,* with the consent of the sureties; and if they afterwards authorized him to strike out the name without their consent, there should be some evidence of this resolution. If *Barrington* made the erasure with the consent of the directors, but without the knowledge and assent of all the sureties, your verdict should be in favor of the defendant. The directors would have the same power over this bond, as over any note discounted by the bank.

The alteration was a most material one for the sureties, for it increased their responsibility, by changing a joint bond of five persons, to a joint bond of four persons only. Their consent was therefore absolutely necessary, before the Directors and *Barrington* could change the nature of the bond. If no person but *Barrington* were concerned, it would be a fraud on the stockholders, and would not avoid the bond. There is no doubt the directors agreed that *Hazlet's* name should be erased from the bond, upon condition the sureties consented: and this appears by the resolution of the 19th April, 1815, and the testimony of *Judge Baird;* but the question is, did the directors consent to the alteration, although the consent of the other sureties had not been previously obtained? did they, at any time after the resolution of the 19th April, consent that the alteration should be made without the consent of the sureties?

It is contended by the defendant's counsel, that the whole declaration of *Barrington,* as proved by *Judge Baird,* must be taken together. The whole declaration is undoubtedly evidence, and has been so received; but it does not strike me, that under the circumstances of this case, you are bound to believe the whole. You may believe part and reject the residue.; for this part of the case does not depend altogether upon *Judge Baird's* testimony, but upon all the facts which have been proved.

It is also contended, that the burden of proof to show who made the erasure is thrown upon the plaintiff. If *Barrington* did not stand in the double relation of agent to the stockholders, and co-obligor, this would doubtless be the case. There is no doubt *Barrington* made the erasure when the bond was in his possession, and it is for him to prove, that it was done with the consent of the directors. You must not lose sight of the fact that this is the cause of *Barrington,* as well as *Moore.* It will then be for you to consider all the circumstances which have been given in evidence, and in the first place to determine by whom the erasure was made, and with whose consent. If the alteration was made by *Barrington* and the directors, without the consent of the sureties, your verdict will be in favor of the defendant, for then it is not his deed. But if, on the contrary, you should believe, that the alteration was made with the assent of all, or

(The Bank of Washington *v.* Barrington and others.)

that *Barrington* made the erasure without the consent of the Board, you will find in favor of the plaintiff.

If you should be of opinion with the plaintiff, in the first place it will be necessary to extend your inquiries, and say what injury the plaintiff has received from the conduct of *Barrington.*. In this part of the case I would remark to you, that the surety has placed himself in the situation of *Barrington;* and that you should not permit yourselves to be influenced by the mere fact, that *Daniel Moore* is a surety. The condition of the bond on which suit is brought, is, that *Barrington* will well and truly perform the duties of cashier of the bank, to the best of his abilities. The bond is taken in compliance with the 5th article of the act of 1814 ; which directs that a bond shall be taken, with two sureties, conditioned for the faithful execution of his office, or appointment. By this the defendant stipulates not only for honesty on the part of *Barrington,* but for skill and diligence in the performance of his duties. A man who accepts an office or trust, of any kind, contracts that he will execute it with competent skill and ability ; and the sureties warrant his faithful performance of the trust, and guarantee that he possesses the requisite skill, diligence, ability and honesty.

We will now direct your attention to the breaches of the condition of the bond, assigned by the plaintiff, some of which have been admitted, and others denied.

*No. 3.* That *Barrington* made an erroneous addition, *there is* no doubt : and if this was a mere mistake or error of calculation, which any prudent and careful man may commit; he is not liable. But if you believe it arose from negligence, or want of care, or want of honesty in the cashier, (and repeated errors in his own favor, is strong evidence of it,) then you will charge the defendant with this item ; unless you should believe that no loss has accrued to the bank, on that account. Of this, it will be necessary for the defendant to satisfy you, as the burden of the proof is thrown on him. It is true no loss may have arisen, but as the error has been proved, he must show the bank has received no injury.

Here I will call your attention to a point in the defence, on which the council for *Mr. Moore* appear very much to rely. It appears that in consequence of the neglect of the officers of the bank in not forwarding the tax due the state, on their dividend, the charter of the bank became forfeit, sometime in the latter end of the year 1817, or the beginning of 1818. The charter was revived by the Legislature the 2d February, 1818. It is contended that, by the forfeiture of the charter, the sureties were discharged. It is argued that this is not the same, but a different institution, and that the sureties are not liable for any delinquen-

.cies which may have taken place after the forfeiture. This is a point not without difficulty ; but inasmuch as this seems to have arisen from the default of *Barrington*, it being his business to attend to the transmission of the tax on the dividend, and the institution has been revived by the legislature, (which I consider the same, and not a different institution,) I instruct you that this part of the defence cannot avail the defendant. This case will doubtless reach the Supreme Court, where this opinion may be reviewed, and, if necessary, corrected.

*No.* 11. The facts of this transaction appear to be these:—*Barrington* was indebted to the bank by note $1,500; and in payment of this note, he transferred stock of the bank to the amount of $1,732 50. Whether he took cash from the bank, or his own note, is of no consequence. This transaction took place on the 11th August, 1819 ; at which time it is not pretended there was any resolution of the board authorizing the transfer. It was then done without authority, and was, unquestionably, a most improper act, on the part of *Barrington*, and particularly under the then circumstances of the bank, which must have been well known to him.

It is argued by the defendant, that this transaction was subsequently ratified by the board ; and if this were so, whether ratified by parol or in writing, it would be sufficient. But the burden of the proof is thrown on the defendant. And when we consider the situation in which *Barrington* stood to the stockholders, as cashier of the bank, who was bound, under the ordinances of the board, to keep minutes of their proceedings, it is certainly no hardship to require more clear and explicit proof, to shew an acquiescence on the part of the board, with a full knowledge of the circumstances, of this transfer of stock by *Barrington*. We have had no proof that they were acquainted with the transaction ; it is a mere inference arising from a general knowledge, which the directors are presumed to have had, of the affairs of the institution. Of the proof, however, you are the judges. So this, under the circumstances of the institution, was a fraud on the part of *Barrington*. *Barrington* was acquainted with all the facts and gave what is not worth more than $750, for $1,750. This was not the conduct of a faithful officer.

*No.* 12. The facts in relation to this charge were these:—*Joseph Pentecost* was indebted to the bank, in a large amount, viz., $10,358. He proposed, 11th August, 1819, to the directors, to pay the debt in four annual payments, and give satisfactory security for the same. He had several notes in bank, which were indorsed by *George Baird, James Brice, James Ashbrook* and *George Morgan*. The board virtually rejected the proposal of *Mr. Pentecost.* They acted on the proposition of *John Mar-*

(The Bank of Washington *v.* Barrington and others.)

*shall* and others, and took no notice of his proposal. And yet we find that *Barrington*, on the 1st September, 1819, took *Pentecost's* judgment bond, payable in four annual payments, to be entered up, on defalcation, the 1st September, 1820. The judgment was entered the 1st September, 1820. He also discharged the sureties from their responsibilities as indorsers. It will be for you to say whether this was a faithful performance of his duties as cashier. In the opinion of the Court, it was not: and if he wishes to justify his conduct, he must shew clearly and explicitly, that his conduct was subsequently ratified by the directors; not merely that it was passed over in silence, but that the board, with a full knowledge of the transaction, ratified and confirmed the conduct of *Barrington.* If you should concur in opinion with the Court, that the defendant has failed in this part of his defence, it will then be your duty to estimate the damages, to the bank, arising from this improper conduct of *Barrington. Barrington* had no right to change the security without the consent of the board: and whether he considered he was benefiting the bank, or not, can make no difference.

The rule by which the damages must be estimated, has already been settled by the Supreme Court, and seems to be, that the surety is only liable for the damages, which probably resulted from the change of the security. The bank is only entitled to recover what it shows it could have recovered, whether that be the whole, or a part of the debts due. It will be for you to transport yourselves back to the year 1819, and from all the circumstances which have been given in evidence, to decide what, in all probability, could have been recovered from *Pentecost* and his indorsers, *Baird, Brice, Ashbrook,* and *Morgan*; provided this change of security had not been made; and, also, provided the claims had been pursued with ordinary diligence and faithfulness.

It is admitted by the defendant, that part, viz., *George Baird's* note for $1000, might have been recovered; but they contend the remainder could not. The plaintiff's council say, that the whole, or at least a greater part, might have been saved to the bank, if common pains had been used. You have heard the testimony and the comments of council, and the Court leave this matter to you, under a firm belief that you will do exact and equal justice to the parties.

*No.* 14. It appears that the bank had ample security for *Barrington's* debt: *Thomas H. Baird* was his indorser. By the act of *Barrington,* without the assent of the directors, so far as it appears, the surety has been released. If the directors did assent to it, *Barrington* should have shewn it. He has produced no resolution of the board, authorizing him to take his own

judgment bond, and release his indorser.  As this differs from the common mode of doing business, and especially as it is in his own business, he should have shewn the authority for this proceeding.  I shall take occasion to speak of the general resolution on which the defendant relies, in another part of this cause.

*No.* 15. *Barrington,* took possession of the funds of the bank without authority.  This was in violation of his duty as cashier. The bank was deprived, without its consent, of the use of its funds.  It is the opinion of the Court, that *Barrington* cannot say he ought not to pay interest.  Nor do I think it a matter of any consequence, whether it was Washington bank paper, foreign notes, or gold and silver.  It was a breach of trust, and whether he used the money or not, can make no difference.  All the money is not yet returned, and the presumption is it went to the use of *Barrington,* or those to whom he sent it.  You will calculate interest on $5,539 88, and also on $4000, and 180 and the balance you will find for the plaintiff.

*No.* 22. This is a most important item.  If the cashier permitted this transfer of stock, without the consent of the directors, there can be no doubt it was a breach of his bond.  It does not appear, but the contrary, that there was any written resolution authorizing the transfer.  In an ordinance of the board, it is ordered, that the directors shall keep fair and regular entries, in a book to be provided for that purpose, of their proceedings: the minutes of the preceding meeting shall be read, before the board of directors proceed to business.  It is the duty of the cashier to make these entries; and it strikes me as most extraordinary, that in a matter of such importance, particularly when we consider the situation of the bank, that this resolution, if any such existed, was not reduced to writing, and entered on the minutes of the board.  It is singular that *Barrington* should permit the transfers, and to such an amount, without some written authority for his justification.  Such, however, appears to have been the fact. There was no resolution in writing; and *Barrington* permitted the transfers to be made without it.

It is contended by the counsel for the defendant, that although not in writing, such a resolution was in fact passed.  While for the purposes of this case, I accede to the proposition, that it may be proved by parol, or inferred from the acts of the board, I instruct you, that, inasmuch as *Barrington* himself, whose duty it was to put the resolution, if any such existed, on the minutes, is attempting to avail himself of it, the proof should be clear; or if inferred from circumstances, they should be such as are totally inconsistent with the non-existence of such a resolution.  It is the duty of the defendant to satisfy you that such a resolution was passed, and the requisite number, viz., seven, were present

(The Bank of Washington *v.* Barrington and others.)

when it was passed. You also, should be informed when the resolution was passed. Without intending to take from you the decision of the facts, of which you are the exclusive judges, I think it my duty to say, that the testimony *is most loose and unsatisfactory.* We do not know the time, and it is extremely doubtful how many were present at the time the resolution is alleged to have been passed. It would seem to have been done, if at all, at an ordinary discount day, when it may be doubtful whether more than five directors were present. We certainly have a right to require more clear proof from *Barrington,* than a stranger; and I must repeat to you that we cannot separate *Moore,* who was the surety, from *Barrington,* the principal.

But suppose the resolution was passed by a quorum of the directors, then another important question arises. It seems that at the time these transfers were made, the bank had already purchased, and owned, more than one-fifth of the stock of the bank. You will recollect that by the purchase of *Mr. Campbell's* stock, the 7th September, 1819, that amount was exceeded by about thirty-five shares. Vide 14th art. Act of 1814. At the time that these transfers were made, the bank already held in their own right, more than one-fifth of the capital stock; so that these purchases were made in express violation of this fundamental article.

I do not believe that the transfer of this stock is void; because the transferers of the stock, who were not directors, may have acted with good faith; but I am of the opinion that the transfer is taken at the risk of the directors. If any loss accrues to the institution, in consequence of it, they are responsible, because they have violated the law, which ought to regulate their conduct.

The question then will be, is *Barrington,* the cashier, in the same or a better situation? Although appointed by the directors, he is the agent of the company, and is bound to the bank, well and truly to perform the duties of cashier. No transfers can be made unless attested either by the cashier or president; *and in point of* fact, they were made with the knowledge and in the presence of *Barrington.* As they were made in violation of a fundamental article of the law regulating banks, he permits the transfer to be made at his own peril, and if any loss accrues to the stockholders he is answerable. *Barrington* must have known the situation of the institution, and so far from protesting against the illegal and improper proceedings of the directors, he avails himself of the resolution and transfers his own stock at par, in payment of his debts, when he must have been well aware that its value had greatly depreciated. Was this the part of an honest agent? did he truly perform his duty as a cashier? It is the opinion of the

(The Bank of Washington *v.* Barrington and others.)

Court that he did not. The distinction I take to be this:—When it is a matter in the discretion of the directors, he is bound to obey their directions; but when it is contrary to law, he acts at his own peril. He, as well as every other citizen, is bound to obey the law, and not the order of the board.

But it is certain that this is a fraudulent transaction on the part of the directors and *Barrington*. There can be no doubt, but that at this time, the institution was very much embarrassed. The stockholders had taken the alarm, and had called a meeting to inquire into the situation of the bank. At this time they passed a resolution, by which they authorized stockholders to transfer their stock at par, in payment of debts. The directors who passed the resolution, and *Barrington*, the cashier, were themselves stockholders and debtors to the bank. We find them immediately availing themselves of the resolution, by transferring their stock, an operation manifestly to the injury of the bank, the stockholders who were not indebted, and to the innocent holders of the notes and depositors. Although, we are bound to have charity for our fellow men, yet it is a difficult matter to conceive how they could justify such conduct to their own consciences. If you should believe that the resolution was past with a view to their own advantage, and not to the common good, or must necessarily be advantageous to them, and injurious to the other stockholders, it was a most gross fraud in all concerned. This would render *Barrington*, who participated in it, and his bail, liable for any loss which the bank may have sustained.

If you should be in favour of the plaintiff in this part of the case, it will then be your duty to estimate the damages, the measure of which will be the loss which the institution has sustained by the improper conduct of the cashier.

It will be for you to examine this item particularly, and give such damages as you may suppose the bank has sustained from this illegal and improper transaction.

I look upon the stock as belonging to the bank; and if you assess the damages which the institution has sustained, you will be doing justice to all parties concerned. It was taken at par, and was not worth more than one hundred per cent. discount. The difference with interest would perhaps be the best rule to adopt.

The Jury returned a verdict for plaintiff of $39,741 02. The plaintiff after motion for a new trial remitted $9,741 02 of this sum. By consent the remittance was to be stricken out if the Supreme Court should think that judgment may be entered for the whole amount of the verdict.

The defendant moved the Court to set the verdict aside, and

6

(The Bank of Washington *v.* Barrington and others.)

grant a new trial, and assigned the following reasons therefor, to wit:.

1. The Court erred in charging the jury, by assuming the fact and telling them that the bond went into the hands of *Barrington* without any erasure, when in truth, there was no testimony given of that fact.

2. The Court erred in telling the jury, that the plaintiff by bringing and declaring in the former suit as it did, alleging the writing upon which this suit is brought to be the bond of *John Barrington, Daniel Moore, John Hughes* and *Thomas Acheson*, is not estopped thereby in this action from declaring the same to be the bond of *John Barrington, Daniel Moore, John Hughes, Thomas Acheson Robert Hazlet*.

3. The Court erred in their charge to the jury, by treating the resolution of April 19th, 1815, being made only by a board of six directors as evidence to prove that the board of directors gave consent to strike out the name of *Hazlet*, with the consent of the other obligors, and then in charging the jury that after such resolution of the board, it was incumbent on the defendant to prove that the board had passed a resolution authorizing *Hazlet's* name to be stricken out without the assent of the other obligors.

4. The Court erred in telling the jury that the burden of proof to shew that the striking out of the name of *Hazlet* was done with the consent of the directors, lay upon the defendant.

5. The Court erred in charging the jury that they might credit a part of the declaration of *John Barrington*, made to *Thomas H. Baird Esq.* and reject the residue of it.

6. The Court erred in telling the jury that they ought not to permit themselves to be influenced by the circumstance of the defendant's being a surety.

7. The Court erred in charging the jury that an error by the cashier in adding the daily account of the transactions of the bank, making it one hundred dollars more than it really was, must be considered as producing a loss to the bank equal to the amount of the error, unless the defendant proved, and it was incumbent upon him to do so, that no loss accrued thereby.

8. The Court erred in charging the jury that the bond made the defendant accountable for the conduct of *John Barrington* as cashier, and for losses occasioned by him to the bank, after the bank to which the bond had been given, had forfeited its charter, and the charter had become null and void, and after the renewal of the charter by an act of the legislature, passed the 2d of February, 1818.

9. The Court erred in assuming without any proof whatsoever, and in direct opposition to the law of the case, that it was the

(The Bank of Washington *v.* Barrington and others.)

duty of *John Barrington* to have sent on, in due time, to the state treasurer, a declaration of the dividends of the bank, and the amount of the duties due thereon to the state, so as to have prevented a forfeiture of the charter.

10. The Court erred in telling the jury, that it was not faithful in the cashier to pay his debt to the bank by the assignment of stock that turned out not to be worth more than half the value at which it was transferred.

11. The Court erred in telling the jury, in substance, that the evidence given of a resolution of the board of directors, having been passed, authorizing the transfer of stock, made on the 28th of September to the 1st of November, 1819; was loose, unsatisfactory, and insufficient, inasmuch as the date of the resolution and the number of directors composing the board at the time of its passage, were not proved.

12. The Court erred in charging the jury that more clear proof of the resolution last above referred to having been passed by a competent number of directors, is required of *John Barrington* or his sureties, than of a stranger.

13. The Court erred in charging the jury that the board of directors had no power to pass such resolution; and that *Barrington* and his sureties were answerable as well as the directors: for any loss the bank had sustained by taking the stock in payment of debts owing to it.

14. The Court erred in charging the jury, that *Barrington* being acquainted with the real situation of the bank, and that being such as to render the receiving of stock in payment of debts injurious to the stockholders not indebted, creditors and depositors, that it was therefore illegal, and *Barrington* and his sureties are liable for the loss.

15. The jury erred in giving a verdict for a sum exceeding the penalty of the bond, on which this suit is brought.

16. The Court erred in permitting the bond to be read in evidence to the jury.

17. The verdict is against the law and the evidence.

The Court over-ruled a motion for a new trial, and entered judgment for the amount of the penalty of the bond, which is $30,000.

Defendant appealed from this decision of the Circuit Court.

The cause was argued in this court at September term, 1829, by *W. Forward* and *Kennedy* for the appellant, and *Baldwin* for the appellee, and held under advisement until this term, when the opinion of the Court was delivered by

Gibson, C. J.—The conclusion at which a majority of the Court has arrived, enables me to dismiss all the reasons for a new trial,

(The Bank of Washington *v.* Barrington and others.)

but one, with a passing remark—that they have not been sustained. The point on which the cause is to be decided, and which was reserved at the trial, not only for its difficulty, but its importance both in principle and amount, arises out of the following facts: The bank was chartered in 1813, and its utmost duration limited to the first of April, 1825. The bond on which suit is brought, was executed in 1814, with condition under-written, that *Barrington* should "well and truly perform the duties of cashier." By the act of incorporation, the president and directors were required to pay annually to the treasurer of the commonwealth, six per cent. of the whole amount of the dividends; on failure of which for a specified period, the charter was thenceforth to become "absolutely NULL and VOID and of no effect whatever," and the bank to be "DISSOLVED, UNLAWFUL, and UNINCORPORATED," except inasmuch as corporate capacity should be necessary to the enforcement of contracts made by it, or with it, before the period of its delinquency. By force of this provision, the charter became forfeited in the beginning of January, 1818; and by an act passed the second of February ensuing, was "revived and continued in as full force and ample a manner as if no forfeiture had taken place." The directors did not order new securities to be given by the officers; and nearly all the defaults of the cashier were subsequent to the act of restoration.

Whatever may have been the constitutional power of the legislature to restore the defendant's obligation without their consent, it certainly was not invoked. Provision was made for notes or bonds discounted or received SUBSEQUENTLY to the forfeiture; but every thing else was left as it had been found, and the point is therefore to be decided on the principles of the common law.

The rule that the liability of a surety is commensurate in duration with the commission of his principal, is well settled in the *United States* v. *Kirkpatrick*, 9 *Wheat.* 720, and the *United States* v. *Vanzant*, 11 *Wheat.* 184. The only apparent exception is the case of a direction to the proper officer to take a new security by a given day; which, in the *United States* v. *Nichol*, 12 *Wheat.* 509, was held not to discharge the old one. But there the continuance of the old security till it should be actually superceded by the new one, was in perfect consistence with the original limitations of the contract: here the question is whether, by one of its limitations, the security had not expired.

By the constitution of this corporation, its existence was subject to be terminated alike by forfeiture of the charter and efflux of time; and for the benefit of each of these as limitations of the term of their liability, the sureties had stipulated, not indeed in terms, but tacitly and by irresistible implication from the nature of the contract. They had treated on the basis of corporate existence as

it then stood, and in reference to all its incidents. They might have seen, and they are therefore to be considered as having known, that the bank was subject to cease by the happening of a contingency, and that with it would cease their liability. Who can say this did not enter into their estimate of the risk which they consented to take on themselves. They were, in effect, insurers, but without a premium, of the cashier's fidelity; and they are entitled to the benefit of any termination of the risk which may be brought within the letter or the spirit of their contract. Their engagement was without a consideration beneficial to themselves, and it is therefore not to be extended beyond its strict technical import. That they, in fact, supposed their liability to be commensurate with the original charter, does not admit of a doubt; for no one will pretend that an extension of the charter would have operated as a correspondent extension of the security. Such an extension might, in popular language, be a continuance of corporate existence; but as regards intervening rights, it would, in fact and in law, be a new creation. Assuredly a renewal of corporate powers extinguished by lapse of time, would not be a renewal of the sureties' bonds, *Arlington* v. *Merricke*, 2 *Saund.* 411, and why should the same principle be inapplicable to extinction by forfeiture? It is the fact of extinction, and not the manner of it, which is material to the question. This is perhaps not denied; but the argument is, that the legislature might waive the forfeiture, or at least avert it before the extinction was complete. Was it, however not complete as to all but new operations? For every thing beside, the bank had, in the words of the act of incorporation, become "dissolved, unlawful, and unincorporated." Nothing was left it but a capacity to set its house in order. But the extinction of corporate existence, may be complete as far as it has gone, without being entire; and if the office was gone as to new operations, so was the liability of the sureties: so that to revive the security as to these, after it had ceased as to all but such as were necessary to close the business, would burden the sureties with responsibilities which had not entered into their stipulations, and bring the point within the principle of the *United States* v. *Kirkpatrick*, and the other cases of that class. The legislature might doubtless have interfered to prevent a forfeiture before one had actually occurred: like medical assistance in the case of one whose life has been insured, that must be taken to have been a tacit condition of the contract. But it was as incompetent, had it been so disposed, to divest an interest which was fixed by actual forfeiture, as it was to divest an interest in the termination of the risk by lapse of time, which was fixed from the beginning. As limitations of corporate existence, the difference between expiration and forfeiture was, that the one was certain and the other

contingent.    But when the latter became certain by the happen-
ing of the contingency, all difference ceased and the same rule was
applicable to both.    The legislature might have waived the for-
feiture, had the performance of an act been necessary to take
advantage of it; but, unfortunately for the argument, the divestiture
of the corporate franchise was consummated by the bare omission.

So far the case seems clear on principle.    But this construction
of the contract is fortified by close analogies from undoubted au-
thorities.    In *Wright* v. *Russel,* 2 *Blac. Rep.* 934, security for
the faithful service of a clerk to a sole trader, was not extended to
a subsequent partnership.    I am aware that the principle of this
case has been questioned, and perhaps with reason; although the
ground of variance between the condition and breach as set out,
on which it was ultimately rested, is admitted to be a tenable one.
In *Barclay* v. *Lucas,* 1 *T. R.* 291, *in note,* a bond for the fidelity
of a son whom the plaintiffs had taken into service in their count-
ing-house and shop, was held not to be discharged by the intro-
duction of a new partner.    But *Lord Mansfield* put the case
on a presumption of INTENTION deducible from the subject-matter
of the contract—fidelity to A HOUSE, which might continue for
generations, by a succession of partners under the same firm, though
none of them should bear the name of any of the original proprietors;
and also on public convenience which required the security to be
considered, as what it probably was intended to be—security to the
house.    *Mr. Justice Willis* considered it natural, that the service
was to be performed in the counting-house, and not to the plaintiff
in particular; and he thought the inconvenience there would be,
in renewing the security with every change of the firm, must have
been in the view of the parties, and was therefore proper to be
considered in expounding their intention: and *Mr. Justice Bul-
ler,* put the case on the same ground.    But in *Barker* v. *Barker,*
1 *T. R.* 287 such a bond was deemed to be no security for the
fidelity of a clerk retained in the employment of the obligee's ex-
ecutor, who had continued the business pursuant to directions in
the will; and this because the contract was in its nature exclusively
applicable to services which were to be performed to the obligee,
and not to his successor, in perhaps an altered state of the business,
produced by his death.    Is not that, in principle, the case at bar,
in which there has been a similar alteration by the civil death of
the bank?    Had this corporation, or any of the numerous family
of which it was a member, acquired by repeated indulgence an
ideal right to a remission of the forfeiture, that, like the ideal right
to a renewal of a church or corporation lease which has sometimes
entered into the consideration of a Court of Equity, might on the
principle of *Barclay* v. *Lucas,* be fairly presumed to have tacitly

entered into the stipulations of the parties.    But there had been no instance of forfeiture and remission previous to the execution of the bond, nor has there been but one beside the present, since. The demise and resuscitation of a bank, under circumstances like the present, are of no ordinary occurrence; nor do they in the least resemble the coming in or going out of a partner which produces no change in the identity or individuality of the obligee, and which, from its frequency, must necessarily be in the contemplation of those who treat in relation to the firm.    The civil, like the natural death of the obligee, dissolves the obligation, although the business be continued on the old footing and under the same authority.    The obligation perishes with the obligee; and being once discharged or suspended, it is gone forever.    Even a voluntary suspension of the REMEDY is attended with the same consequences. 20 *Ed.* 4, 17.  21 *Ed.* 4, 36.  *Dyer,* 140.  *Hob.* 10.  *Cro. Eliz.* 150. *Cro. Car.* 375.  *Sir. W. Jones,* 345.  But the case of *Dance* v. *Girdler,* 1. *N. R.* 34, is nearer to the present than any of the preceding.    There a bond to the trustees of an unincorporated association for the fidelity of one of its officers, was determined to be no security for his fidelity after the association had become incorporated, because its provisions were inapplicable to a state of corporate existence, which, it was thought could not have been in the contemplation of the parties.    Lastly, in *Strange* v. *Lee,* 3 *East.* 484, it was held that the death of even *one* of two or more obligees, determined the security.

It has been said that as both parties, here, proceeded on a supposition that the security remained good, their silence was a waiver of the forfeiture by themselves, to which they were undoubtedly competent.    If however the bond was actually determined, I am unable to perceive how it could be set up again but by a new delivery; and although I will not say that fraud and imposition might not be left to a jury as evidence of such delivery, yet as the case calls for no opinion on that point, we give none.    The mistake, if any, as to the continuance of the security, was common to both parties, and their silence under it would not prevent them from standing on their original rights.   The directors were bound to know that further responsibility by virtue of the bond, was at an end; and having in the absence of an intimation from the other side, no reason to presume the existence of consent to its restoration, it was their business to put an end to uncertainty on this head, by a direct inquiry.    Having omitted it, they must be considered to have taken the risk of the cashier's future fidelity on the bank.    But it has been pressed, that as the omission which caused the forfeiture, was a breach of his duty, the sureties are answerable for all the consequences of it, whether immediate and direct, or remote and consequential.    Undoubtedly his negligence

(The Bank of Washington *v.* Barrington and others.)

in this particular was a forfeiture of their bond; but what is the measure of the damages? Certainly the extent of the loss which it necessarily and naturally occasioned; not a loss occasioned by the plaintiff's own negligence or ignorance. The directors were bound not only to know the law, but to take all proper precautions; and if they failed to do so, the consequences are attributable to them, and not to the sureties, who are liable only for losses or expense incurred before the restoration of the charter, and which were occasioned by misfeasance or nonfeasance before the forfeiture of it. A new trial is awarded to enable the parties to ascertain the damages according to this principle, if that should be necessary, by another jury.

HUSTON, J.—Dissented.

ROSS, J.—Took no part, not having heard the argument.

Judgment reversed, and a new trial granted.